UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NO. 3:07-CR-00124-B |
| | § | |
| CHRISTOPHER ALLEN DAVIS | § | |
| Defendant. | § | |

## MEMORANDUM ORDER

On November 19, 2007, the Court held a hearing on Defendant's Motion to Suppress Evidence (doc. 33). For the reasons stated on the record and in this Order, the Court determined that the Government did not meet its burden of establishing an exigency justifying the warrantless entry of Christopher Davis's home to make an arrest. The Court will determine whether consent justified entry into the home and whether the evidence should be suppressed as "fruit of the poisonous tree" after the parties file further briefing on these issues.

### I. BACKGROUND

On October 8, 2006, Deputies Thomason and Young from the Rockwall County Sheriff's Office responded to a 911 family violence call placed by Ashley Cupito ("Cupito").[1] The officers found Cupito and a male witness standing under the carport of Christopher Davis's ("Davis") home. The officers interviewed Cupito and the witness who stated that Davis had assaulted Cupito. The officers also observed physical evidence of the assault on Cupito's body. Cupito, who was frightened

---

[1] Unless otherwise noted, the Court takes its facts from the evidence presented at the hearing on the motion to suppress. Deputies Thomason and Kirby testified at this hearing.

1

and agitated, told the officers that she had lived at the residence for about a week, that Davis had frightened her friends away, and that Davis was in the residence.

After Deputy Kirby arrived, Deputies Kirby and Thomason knocked on Davis's front door and announced that they were with the sheriff's office. Deputy Thomason testified that he had probable cause to arrest Davis and intended to identify Davis, speak with him, hear his side of the story, and make the arrest. He also claimed that he was aware that Davis had a criminal background. When Davis opened the door, the officers explained that they were investigating family violence. At first Davis denied that there was any violence or that anyone else was staying in the home. While the testimony on this point is unclear, it appears that Davis later stated that Cupito had been living in the back room or that her belongings were in the back room for a couple of weeks. At this point, Deputy Kirby testified that the officers gave each other a "look" indicating that they should make an arrest. One of the deputies requested that Davis produce his identification. Deputy Kirby explained that it was the standard practice to ask for identification before making an arrest. Thomason stated that they requested identification to obtain information on the suspect. Davis responded to the request for identification by stating that his identification was in his vehicle and asking the officers if he could retrieve his keys. In the next few moments, one of the officers agreed to let Davis retrieve his keys, Deputy Kirby told Deputy Thomason to follow Davis inside the home, Davis attempted to close the door, and Deputy Kirby stopped Davis from closing the door. Deputy Thomason explained that he was afraid that Davis would retrieve a weapon or that he would lock the door and flee outside. Thomason stated that he could not recall if he was told that Davis had weapons and explained that once there is probable cause to arrest, the officers do not let the suspect out of their sight. A struggle between Davis and the officers ensued, and the officers leaned Davis

over a pool table inside the home, placed handcuffs on him, and read him his *Miranda* rights.  Davis was restrained at around 5:35 a.m., and he was not transported to the detention center until 6:54 a.m.

Deputy Thomason claimed that after Davis had been arrested but while he was still in the house, Davis agreed to let him turn down the music in his bedroom.  While in Davis's bedroom office, Deputy Thomason saw two glass tubes with a milky white residue and a butane torch.  In the bedroom where Cupito had been staying, Cupito showed one of the officers what had occurred during the alleged assault.  The officer observed drug paraphernalia, pills, and handwritten instructions on cultivating plants.  Cupito stated that Davis was growing mushrooms in another room.  At around 7:00 a.m in Davis's kitchen, while Cupito and the male witness were writing statements regarding the assault, Deputy Thomason observed zip top bags with the words "stay high" written on them.  (Gov't's Resp. to Davis's Mot. To Suppress ¶ 24).  Cupito also stated that Davis had used his computer to counterfeit money.  (*Id.* at  ¶ 25).  Based on the above information, the officers obtained the first search warrant to search for drugs, drug paraphernalia, and equipment used to counterfeit currency.   (*Id.* at   ¶ 26-27).  During this search, the officers located drug paraphernalia, mushrooms, ink cartridges, a shredded counterfeit bill, two safes, and a $96,000 entry into Davis's checking account deposit register. (*Id.* at 11 n.5). Based on this information, the officers obtained a second warrant to seize and search computers, printers, and safes.  (*Id.* at ¶ 29).  During a forensic examination of Davis's hard drive, a United States Secret Service Agent observed images of what appeared to be child pornography.   (*Id.* at  ¶ 32). Based on this information, she obtained a search warrant to search Davis's computers for child pornography.   (*Id.* at  ¶ 25).

On April 4, 2007, a grand jury charged Davis with Receiving Child Pornography (18 U.S.C.

§ 2252A(a)(2)(B)) and Counterfeit Currency (18 U.S.C. § 471) (doc. 1). On September 21, 2007, Davis moved to suppress the evidence of the alleged counterfeit $100 bill and the images allegedly depicting child pornography on the following grounds: (1) the warrantless arrest of Davis in his home violated his Fourth Amendment rights; (2) the warrantless search of Davis's home violated his Fourth Amendment Rights; (3) the counterfeit bill and images of child pornography were the inadmissable fruits of an unconstitutional search; (4) no probable cause supported the first or second warrants; and (5) the seizure of the images of child pornography exceeded the scope of the search warrant (doc. 33). The Court determined that whether exigent circumstances existed permitting the officers to enter Davis's home was a threshold issue and requested that the parties focus on this issue in the hearing.

## II. Analysis

The Fourth Amendment prohibits the police from entering a home to make a warrantless arrest absent exigent circumstances or consent even when probable cause exists: "To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *Payton v. New York*, 445 U.S. 573, 588-89 (1980). The government bears the burden of demonstrating exigent circumstances to overcome the "presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). This burden is particularly difficult to overcome when the police enter a home to arrest for a minor offense. *Id.* "Whether exigent circumstances exist is a question of fact, reversible only if the district court's factual findings are clearly erroneous. We look to the totality of the

circumstances surrounding the officers' actions, mindful that our review is 'more akin to examining a video tape by instant replay than to examining a snapshot.'" *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) (quoting *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995)). Exigent circumstances include: (1) reasonable fear for officer's safety; (2) presence of firearms; (3) risk of a criminal suspect escaping; or (4) fear of destruction of evidence. *Rico*, 51 F.3d at 501. The Court will consider the following factors to determine whether an exigency exists: "(1) the degree of urgency involved and amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). Police officers may not create an exigency. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). "Exigent circumstances may not consist of the likely consequences of the government's own actions or inactions. In determining whether officers create an exigency, this Court focuses on the 'reasonableness of the officers investigative tactics leading up to the warrantless entry.'" *Id.* at 355 (quoting *Jones*, 239 F.3d at 720). A finding of manufactured exigency does not require bad faith on the part of the officers. *United States v. Howard*, 106 F.3d 70, 78 (5th Cir. 1997)

Based on the officers' credible testimony in the five hour evidentiary hearing, the Court determined that any emergency that existed based on Cupito's 911 call had ended when the officers approached Davis's door. The officers had spoken to Cupito, and she was standing safely outside Davis's home. Both officers testified that they had determined that they would arrest Davis before

5

they requested his identification. If there was an exigency that Davis would harm the officers, retrieve a weapon, flee, or destroy evidence, it was created when the officers requested and consented to Davis reentering his home to retrieve his identification. Even though the officers were acting in good faith, this police-created exigency does not justify their invasion of the "sanctity of the home" to effect a warrantless arrest. *See Payton*, 445 U.S. at 589. Accordingly, the Government has not met its heavy burden of establishing an exigency.

### III. CONCLUSION

The Court has determined that there was no exigency justifying the officers' entry into Davis's home to effect a warrantless arrest. The Court has requested further briefing to determine whether the officers had consent to enter Davis's home and whether all of the evidence should be suppressed under the "fruit of the poisonous tree" doctrine.

**SO ORDERED.**

**SIGNED November 29th, 2007**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE