UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NO. 3:07-CR-00124-B |
| | § | |
| CHRISTOPHER ALLEN DAVIS | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM ORDER

On December 20, 2007, the Court held a hearing on the Government's Motion to Reconsider the Court's Order Granting Defendant's Motion to Suppress (doc. 82). The Court **DENIED** this Motion to Reconsider based on the reasons stated in the record and in this Order.

## I. BACKGROUND

A.  Factual Background

By way of background, on October 8, 2006, Deputies Thomason and Young from the Rockwall County Sheriff's Office responded to a 911 family violence call placed by Ashley Cupito ("Cupito").[1] The deputies found Cupito and a male witness standing under the carport of Christopher Davis's ("Davis") home. They proceeded to interview Cupito and the witness who reported that Davis had assaulted Cupito. The deputies observed physical evidence of the assault on Cupito's body. According to the deputies, Cupito, who was frightened and agitated, told them

---

[1] Unless otherwise noted, the Court takes its facts from the evidence presented at the hearing on the motion to suppress on November 19, 2007 and the hearing on the motion to reconsider on December 20, 2007.

that she had lived at the residence for about a week, was at Davis's home to collect her belongings, that Davis had frightened her friends away, and that he was in the residence.

After Deputy Kirby arrived, Deputies Kirby and Thomason knocked on Davis's front door and announced that they were with the sheriff's office. Deputy Thomason testified that he had probable cause to arrest Davis and intended to identify Davis, speak with him, hear his side of the story, and make the arrest. He also claimed that he was aware that Davis had a criminal background. When Davis opened the door, the deputies explained that they were investigating family violence. At first, Davis denied any violence or that anyone else was staying in the home. Eventually, Davis divulged to the deputies that Cupito had been living in his back room or that her belongings were in the back room for a couple of weeks. At this point, Deputy Kirby testified that the deputies gave each other a "look" indicating that they should make an arrest. Deputy Kirby recounted that it was their department's standard procedure to ask for identification before making an arrest. In keeping with this practice, Thomason stated that they requested i.d. from Davis. Davis responded to the request by stating that his identification was in his vehicle and asking the deputies if he could retrieve his keys. One of the deputies agreed to let Davis retrieve his keys, Deputy Kirby told Deputy Thomason to follow Davis inside the home, Davis attempted to close the door, and Deputy Kirby stopped Davis from closing the door. Deputy Thomason explained that he was afraid that Davis would retrieve a weapon or that he would lock the door and flee outside. Thomason stated that he could not recall if he was told that Davis had weapons and explained that once there is probable cause to arrest, the deputies do not let the suspect out of their sight. A struggle between Davis and the deputies ensued, and the deputies leaned Davis over a pool table inside the home, placed handcuffs on him, and read him his *Miranda* rights. Davis was restrained at around 5:35 a.m.,

and he was not transported to the detention center until 6:54 a.m.

At approximately 5:40 a.m., *after* Davis had been arrested, Davis told the deputies that they were not allowed in his house, that they needed a search warrant, and that they needed probable cause. (Def.'s Reply Br. to Gov't's Consent Br. 20 (citing Gov. Ex. 11; Def. Ex. 1 at 8:5-8:22)). Deputy Thomason claimed that after Davis had been arrested but while he was still in the house, Davis agreed to let him turn down the music in his bedroom. Deputy Kirby also testified that Davis allowed Thomason into his room to turn the music down. However, later in the recording made on the date of the search[2], Deputy Kirby can be heard asking Deputy Thomason why he had been in Davis's room. While in Davis's bedroom office, Deputy Thomason saw two glass tubes with a milky white residue and a butane torch. Cupito testified that after Davis had been arrested, the officers requested that Cupito show them where the assault occurred and she took them to the bedroom where she had been staying. There was contradictory testimony on whether Cupito entered the front door passing Davis on the way to the bedroom or entered the back door without passing Davis. In the bedroom where Cupito had been staying, Cupito showed one of the deputies what had occurred during the alleged assault. The deputy observed drug paraphernalia, pills, and handwritten instructions on cultivating plants. Cupito stated that Davis was growing mushrooms in another room.

At around 7:00 a.m. in Davis's kitchen, while Cupito and the male witness were writing statements regarding the assault, Deputy Thomason observed zip top bags with the words "stay high"

---

[2]The Rockwall County Sheriff's Office made an audio/video recording on the date of Davis's arrest which proved to be a key piece of evidence on the issue of suppression. The Court notes that the Government did not produce the entire recording until October 30, 2007–one week before the suppression hearing was originally scheduled on November 6, 2007 (doc. 64 at 1-2).

written on them. (Gov't's Resp. to Davis's Mot. to Suppress ¶ 24). Cupito also stated that Davis had used his computer to counterfeit money. (*Id.* at ¶ 25). Based on the above information, the deputies obtained the first search warrant to search for drugs, drug paraphernalia, and equipment used to counterfeit currency. (*Id.* at ¶ 26-27). During this search, the deputies located drug paraphernalia, mushrooms, ink cartridges, a shredded counterfeit bill, two safes, and a $96,000 entry into Davis's checking account deposit register. (*Id.* at 11 n.5). Based on this information, the deputies obtained a second warrant to seize and search computers, printers, and safes. (*Id.* at ¶ 29). At some point, the officers brought Davis back from the detention center to open the safe. During a forensic examination of Davis's hard drive, a United States Secret Service Agent observed images of what appeared to be child pornography. (*Id.* at ¶ 32). Based on this information, she obtained a search warrant to search Davis's computers for child pornography. (*Id.* at ¶ 25). On April 4, 2007, a grand jury charged Davis with Receiving Child Pornography (18 U.S.C. § 2252A(a)(2)(B)) and Counterfeit Currency (18 U.S.C. § 471) (doc. 1).

B.  Procedural Background

The parties have submitted three rounds of briefing on the Defendant's Motion to Suppress, and the Court has conducted two hearings - totaling more than eight hours - on the suppression issue. After considering the Defendant's Motion to Suppress, the Government's Response, and the Defendant's Reply, the Government held a five hour hearing on November 19, 2007. In this hearing the Court determined that there were no exigent circumstances that permitted the deputies' entry into the house. The Court requested further briefing on the issues of consent and "fruit of the poisonous tree." In its briefing, the Government argued that Cupito, a co-occupant of the home, consented to the entry of the residence and that Davis did not expressly refuse to allow Cupito's or

4

the deputies' entry. (Gov't's Br. 1-2). The Government also argued, under the "independent source" doctrine, that the items observed in plain view after the deputies entered the residence with Cupito's consent, were independent from information received during and related to the arrest of Davis. (Gov't's Br. 12). Finally, the Government contended that the deputies discovered incriminating information after entering the residence with Cupito's consent and that the deputies "(1) would have obtained a warrant for the arrest of Davis, and (2) did obtain a search warrant for the search of the residence." (Gov't's Br. 1314). Davis responded to the Government's brief arguing: (1) "The Government Previously Abandoned The Consent Argument It Now Makes;" (2) "The Government Has Presented No Evidence that Cupito Consented to a Search of Any Part of Davis's Residence;" (3) "Because Cupito Had No Rights to Davis's Residence, She Could Not Effectively Consent to a Search;" (4) "Even if Cupito Did Effectively Consent, Such Consent Did Not Cure the Prior Unlawful Warrantless Entry;" (5) "Davis's Clear Objection to the RCSO's Entry and Search Renders Cupito's Consent Invalid;" and (6) "Because the Government's 'Independent Source' and 'Inevitable Discovery' Theories Presuppose Valid and Effective Consent by Cupito, They Are Inapplicable Here." (Def.'s Reply to Gov't's Consent Br. 11-26). In its Order of December 3, 2007, the Court granted the motion to suppress the evidence because it found that Davis had expressly refused to consent to the officers' entry. (doc. 81).

On December 5, 2007, the Government filed the instant motion to reconsider the following issues: (1) exigency, (2) consent, and (3) independent source and inevitable discovery. In its Order setting the hearing on this motion, the Court stated that it would not reconsider the issue of exigency because the Government had an opportunity in a five hour hearing to present evidence on this issue. (doc. 84). The Court stated that it would consider the issues of consent and express refusal at the

hearing. With regard to the issues of independent source and inevitable discovery, the Court stated, "To the extent the Government wishes to make this argument at this late hour, it should be prepared at the hearing to explain to the Court why it did not mention this argument in its two previous briefings." (doc. 84 at 2).

II. Analysis

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001) (citations omitted). The Government bears the burden of proving that either exigent circumstances or consent justified a warrantless entry into the home. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997).

A. Exigency

The Court stated that it would not reconsider its ruling that an exigency did not justify the deputies' entry into the home. The Court's Order dated November 29, 2007, explains its reasoning for finding no exigency (doc. 78); therefore, the Court will briefly address the issue here. Police officers may not create an exigency. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). "Exigent circumstances may not consist of the likely consequences of the government's own actions or inactions. In determining whether officers create an exigency, this Court focuses on the 'reasonableness of the officers investigative tactics leading up to the warrantless entry.'" *Id.* at 355 (quoting *Jones*, 239 F.3d at 720). A finding of manufactured exigency does not require bad faith on the part of the officers. *United States v. Howard*, 106 F.3d 70, 78 (5th Cir. 1997).

In this case, any emergency created by Cupito's 911 call ended when the deputies arrived

6

on the scene to find her safely outside Davis's house. According to their testimony, the deputies made the decision to arrest Davis before they requested his identification. If there was an exigency that Davis would harm the officers, retrieve a weapon, flee, or destroy evidence, it was created when the officers requested and consented to Davis reentering his home to retrieve his identification. This police manufactured exigency did not justify entry into the home.

Furthermore, even if there was an exigency that was not created by the deputies, the exigency would have ended after they handcuffed Davis and would not justify the deputies remaining in his home. *See Tierney v. Davidson*, 133 F.3d 189, 197-98 (2d Cir. 1998) ("As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present . . . The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry-the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance."). Because there was no exigency, the only other way the Government may justify the deputies' entry is by consent.

B.  Consent

The Government has the burden of proving that consent "was freely and voluntarily given and that the individual who gave consent had authority to do so." *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997). When the police obtain consent from a third party, the Government must prove that the third party had actual or apparent authority to consent. *Id.* In order to establish actual authority, the Government must show "'mutual use of the property by persons generally having joint access or control for most purposes.'" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). In order to establish apparent authority, the Government must show "that

the officers reasonably believed that the third party was authorized to consent." *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).

In *Moffett*, the Fifth Circuit held that statements by two women that they lived in the apartment and the police officer's observations of women's clothing in the apartment were insufficient to establish that the women had authority to consent to the search. *Moffett v. Wainright*, 512 F.2d 496, 499 (5th Cir. 1975). In *Gonzalez*, the resident's girlfriend told the officer that she had been living in the residence for a little over a week but produced identification showing a different address. *United States v. Gonzalez Athehorta*, 729 F. Supp. 248, 257 (E.D.N.Y. 1990). The Court held that this was insufficient to establish apparent authority and that the officer should have requested a lease or rent receipts but instead "opted to remain ignorant." *Id.* at 257-58. "Exceptions to the warrant requirement of the Fourth Amendment are narrowly drawn. This fundamental right can not be eroded simply because the government seeks to take the path of least resistance by obtaining consent from an individual whose interest in the premises is vague and attenuated." *Id.* at 258. The Western District of Texas has also recognized that police officers should further investigate when authority to consent is unclear:

> "Under *Matlock* and *Rodriguez* agents faced with [ambiguous or unclear] situations must make further inquiries before engaging in warrantless searches. If the information gleaned from those inquiries is insufficient to establish apparent authority, the Fourth Amendment demands that the agents procure a warrant." Thus, agents cannot rely on the apparent authority doctrine to justify a warrantless search based on third party consent when they lack a sufficient factual basis to conclude that the third party had the authority to consent. "If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful *without further inquiry.*'"

*United States v. Corral*, 339 F. Supp. 2d 781, 794 (W.D. Tex. 2004) (quoting *United States v.*

*Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991)).

It is unlikely that Cupito's compliance with the deputies' order to show them where the assault took place constitutes consent. Even if Cupito did consent to the deputies' entry, her consent is invalid because she did not have actual or apparent authority to consent. The evidence presented at the hearing shows that Davis had given Cupito a place to stay until she found somewhere else to live and that she had stayed at Davis's residence on and off for between one and three weeks.[3] Cupito also stated that there had been a lot of girls staying in the room and that not all of the belongings in the room were hers. Cupito had some belongings--some clothes and makeup-- in the residence. Cupito was not having mail sent to the house and did not supply food for the house. At the time of the search Cupito had already decided that she was moving out of the home and had returned to collect her belongings. In addition, Chris had locked her out of the home. Based on these facts, the Court concludes that Cupito's relationship with the home was questionable and that she did not have the requisite mutual use of the property for actual authority.

Having determined that Cupito did not have actual authority, the Court must now determine whether she had apparent authority. According to Officer Kirby, he had been told that Cupito had been staying at Davis's home for a couple of weeks, was moving out, and was coming to gather her belongings. In addition, the transcript of the recording made on the date of the search reflects that Davis told the officers that Cupito did not live there. These facts are very similar to Gonzalez in which the girlfriend stated that she had been living there for about a week. *United States v. Gonzalez Athehorta*, 729 F. Supp. 248, 257 (E.D.N.Y. 1990). In this case, the fact that Cupito had

---

[3] The Court notes that based on her demeanor and her argumentative, unresponsive answers, Cupito's testimony was not credible. Furthermore, her story changed as her testimony proceeded.

9

been staying there for a short time and was moving out should have caused the officers to doubt her authority to consent. Instead of further investigating the situation, they chose to remain ignorant and bypassed Davis, whom they knew had a superior interest in the house. *See id.* at 257-58; *United States v. Impink*, 728 F.2d 1228, 1234 (9th Cir. 1984) ("[W]hen the police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain."). The Court determines that the deputies did not reasonably believe that Cupito had authority to consent; therefore, the Government has failed to establish apparent authority. Even if Cupito had actual or apparent authority to consent and did consent to the deputies' entry into Davis's home, as discussed below, Davis's express refusal of their entry would make her consent invalid.

C. Express Refusal

"Warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). In *Randolph*, Scott Randolph unequivocally refused an officer's request for consent to search his home. *Id.* at 107. The officer then turned to his estranged wife who consented to the search. *Id.* at 107. The Supreme Court held that the evidence found as a result of this search should be suppressed because "a physically present co-occupant's stated refusal to permit entry prevails [over the other occupant's consent], rendering the warrantless search invalid as to him." *Id.* at 106.

Interpreting "express refusal of consent," the Tenth Circuit held that a defendant who barricaded himself inside his home did not expressly refuse consent to search. *United States v. McKerrell*, 491 F.3d 1221, 1226 (10th Cir. 2007). The evidence that supported this finding was that

the defendant never told the officers to stay out of his home and while speaking on the phone with the officers regarding the arrest warrants he did not express concern over the possibility that his home would be searched. *Id.* On the other hand, in *Sims*, the Court determined that slamming the door in the officer's face was an express refusal of consent. *United States v. Sims*, 435 F. Supp. 2d 542, 545 n.5. (S.D. Miss. 2006). Finally, in *Henderson*, the Court held that the defendant's statement to "Get the f*** out of my house" was an express refusal of consent. *United States v. Henderson*, 2006 WL 3469538, at *1 (N.D. Ill. 2006).

Applying these interpretations of express refusal to this case, the Court finds that Davis expressly refused to consent. The Court previously held that the following exchange constituted express refusal:

> "Davis: You don't have a search warrant. . . Officer: We don't need a search warrant. . . .Davis: You can't come into my house if I say you're not allowed in here. . . Officer: Why do we need a search warrant for. . .Davis: No. . .I'm not saying that you do. . .but. . . Officer: What you just said. . .that I need a search warrant. . .No. . .I did not. . .what I'm trying to say is. . .come in my house. . .Officer: Okay. . .Davis: You have to have probable cause. . . and it is not because of some person that just up and calls the phone. . ."

(Def.'s Reply Br. to Gov't's Consent Br. 20 (citing Gov. Ex. 11; Def. Ex. 1 at 8:5-8:22)). The Court is not persuaded to change its determination based on the Government's arguments that Davis was proposing hypothetical questions and not refusing consent. In addition, as in *Sims*, Davis attempted to close the door, which would also indicate his express refusal. Unlike the defendant in *McKerrell*, the conversation quoted above shows that Davis expressed concern over a search of his home. Finally, the Government's argument comparing the level of articulation required to expressly refuse consent to that required to invoke the right to counsel during a custodial interrogation cites no authority that this standard should apply.

11

The evidence presented at the hearing does not support, and perhaps contradicts, the Government's contention that Davis consented to the officers entering his room to turn down the volume of his music. Deputy Kirby testified that Davis instructed Deputy Thomason on how to turn down the music. However, the transcript of the recording reflects that after Kirby allegedly heard these instructions, Kirby asked Thomason why he even went into Davis's room.[4] If Kirby had observed Davis consenting to entry into his room, as he testified, he would have known why Thomason had entered the room and would not have asked this question. credible on this point. The Court concludes that Davis did not consent to the entry into his room to turn down the music and that he expressly refused to consent to the deputies' entry. Kirby's testimony to the contrary was not credible. Accordingly, the Government may not justify the deputies' entry by consent.

D.      Independent Source and Inevitable Discovery Doctrines

Having found that no exigency or consent justified the deputies' entry into the house, the fruit of the poisonous tree doctrine would require the suppression of all of the evidence unless the Government can show an exception. The fruit of the poisonous tree doctrine or the derivative evidence doctrine "requires exclusion of evidence that is the indirect product or 'fruit' of unlawful police conduct.'" *United States v. Johnson*, 95 F.3d 1149, at *8 (5th Cir. 1996) (unreported case). The Fifth Circuit has recognized three exceptions to this rule in which the evidence is admissible because it has been purged of its taint:

---

[4]In its Order dated November 29, 2007, the Court stated, "Based on the officers' credible testimony in the five hour hearing, the Court determined that any emergency that existed based on Cupito's call had ended when the officers approached Davis's home." (doc. 78 at 5). The Court is not now contradicting its determination that the deputies testified credibly regarding exigency during the first hearing. The Court has found that Deputy Kirby offered contradictory testimony during the second hearing regarding whether Davis instructed Deputy Thomason on how to turn down the music.

12

> First, derivative evidence should not be suppressed when "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" Second, under the independent source exception to the fruit of the poisonous tree doctrine, evidence is admissible if it was discovered by means wholly independent of the constitutional violation, even if the same evidence was also discovered during or as a consequence of illegal police conduct. Finally, if the prosecution demonstrates by a preponderance of the evidence that tainted derivative evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible.

*Id.* at *9 (citations omitted). For the independent source doctrine to apply, the Government must show "(1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (i.e., that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming from the illegal search." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002) (citations omitted). To establish the inevitable-discovery exception, the Government must show by a preponderance of the evidence "(1) a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct and (2) that the government was actively pursuing a 'substantial alternate line of investigation at the time of the constitutional violation.'" *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991) (citations omitted).

To support any of these exceptions, the Government would only be able to rely on information the deputies obtained outside of the house because, as already discussed, they had no legal right of access inside the home based on exigency or consent. However, the Court finds that the Government has waived any independent source or inevitable discovery argument based on information obtained outside the home. In its initial response to the Defendant's motion to suppress, the Government did not even mention the independent source or inevitable discovery doctrines. After the first hearing, the Court requested further briefing on consent and "fruit of the

13

poisonous tree." In this briefing, the Government raised independent source and inevitable discovery arguments based on the information the officers obtained after they entered Davis's home (doc. 76 at 12-14). After holding that Davis expressly refused to consent to the officers' entry, the Court stated that it need not address the arguments based on independent source and inevitable discovery because they relied on the validity of Cupito's consent, which the Court found to be invalid. In its motion for reconsideration, the Government stated, "The information gathered during the interviews of the co-occupant, both inside *and outside* of the residence, was independently obtained, and sufficient to support a search warrant." (doc. 82 at 2). In its Order setting the hearing, the Court noted that the Government appeared to be raising a new independent source and inevitable discovery argument based on information obtained outside the home and stated, "To the extent the Government wishes to make this argument at this late hour, it should be prepared at the hearing to explain to the Court why it did not mention this argument in its two previous briefings." (doc. 84 at 2). During the hearing, the Government did not raise these issues. The Government rested its case with additional time remaining. The Court finds that it gave the Government ample opportunities to raise this issue in three rounds of briefing and in two hearings. Having failed to raise the issue, on which the Government has the burden of proof, the Government has waived the argument.

III. Conclusion

For the foregoing reasons, the Government's Motion to Reconsider the Court's Order Granting Defendant's Motion to Suppress is **DENIED.**

**SO ORDERED**

**SIGNED January 8th , 2008**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE